**Gene FLYNN, Appellant,**

v.

**James SONGER and David L. Van Horn, Appellees.**

Court of Appeals of Kentucky.

Feb. 18, 1966.

George M. Combs, Lexington, for appellant.

David L. Van Horn, A. Gene Oliver, Lexington, for appellees.

Robert B. Hensley, Elizabethtown, State Bar Ass'n, N. Mitchell Meade, Lexington, Fayette County Bar Ass'n, amici curiae.

PALMORE, Judge.

Gene P. Flynn brought this suit against James Songer and David Van Horn for compensatory and punitive damages based on allegations of malicious prosecution and abuse of process. He appeals from a judgment of dismissal entered on a jury verdict in favor of the defendants.

In November and December of 1961, when the events of legal significance in the case took place, Flynn was employed by a corporation, General Tire Service, Inc., as its credit manager. Songer was a truck driver for Vogue Rattan Manufacturing Company, and Van Horn was a practicing lawyer in Lexington. Several years before that time Songer, while in the employment of a sewing machine company, had bought some tires on credit from General Tire Service, Inc., and in 1961 the sum of $34.53 remained unpaid on the account. Flynn contacted Songer in an effort to collect this balance, but Songer claimed it was owed by his former employer, the sewing machine company, for whom the tires had been purchased, and referred the matter to his friend and attorney, Van Horn. Flynn advised Van Horn that if the account was not paid he would be forced to attach Songer's wages, and on two occasions Van Horn told Flynn "not to garnishee his wages."

On November 24, 1961, acting in the name and behalf of his employer, the tire company, Flynn instituted a garnishment proceeding against Songer in a justice of the peace court. We continue the narrative in Van Horn's words:

"Then in late November Jim [Songer] came in to see me and said 'my wages have been garnisheed.' I then asked him who garnisheed his wages and he replied that General Tire Corporation through Gene Flynn; that his employer had notified him that his wages were attached and that he stood to be fired unless he got it straightened out.

"He asked me what he could do and I told him that he could do one of two things, or he could do both. I stated that he could fight the attachment in court, have a hearing, or he could get a warrant for Gene Flynn for practicing law without a license. I advised him that Flynn was representing the General Tire Corporation and that it was my understanding under the law that a person who is not an attorney cannot represent a corporation, and the law so states that one cannot represent anyone else unless—the person can represent himself but he cannot represent anyone else in court, and that is the general feeling. * * * I say I gave him the advice and Jim obtained the warrant for the arrest of Gene Flynn for practicing law without a license, which we believe he was doing and which we still believe he was doing."

A warrant for Flynn's arrest was issued on November 30, 1961, pursuant to Songer's affidavit before the issuing magistrate that on November 24, 1961, Flynn had committed the offense of practicing law without a

license in violation of KRS 30.010 (the statute number having been provided to Songer by Van Horn). According to Songer's testimony, this action was precipitated as follows:

"I went to see Mr. Van Horn and told him I was garnisheed over the incident I had talked to him about over the phone, and I had a copy of the paper they served on me and I gave it to him and I asked him advice on what to do, and he told me I could do one of two things, or both, fight the garnisheement [sic] in court or have the man arrested for practicing law without a license.

Q. "And what did you decide to do? Both?

A. "Both."

Flynn was arrested by a county policeman at his employer's place of business in the afternoon of the day on which the warrant was issued. Between the time the warrant was issued (or, as to Van Horn, after he knew it had been or was about to be issued) and the time of arrest both Songer and Van Horn communicated with Flynn. Songer went to see him personally and Van Horn called him on the telephone. Songer testified, "I went out there purposely to see if we couldn't do away with this thing without any trouble. I didn't want any trouble. * * * Trouble both of us getting into a hassle over this, and everything." Songer further said that he visited Flynn against Van Horn's advice to the contrary, and he insisted that he did not intend or attempt to use a dismissal of the warrant to bargain for or coerce a dismissal of the garnishment proceeding. Nevertheless, he did admit that his purpose in procuring the arrest warrant was twofold, bringing Flynn to justice for violating the law and "fighting the garnisheement too." He did not deny that during the conversation with Flynn on November 30 he informed Flynn of the arrest warrant.

Van Horn's explanation of the object of his call to Flynn was not entirely clear. The respective accounts of this conversation as related by Flynn and Van Horn were quite different. According to Van Horn, however, "I called Mr. Flynn on the attachment; that he had filed an attachment against him and that he should release it or he should work out something, and I wanted to know why he had filed it." Like Songer, Van Horn denied any intention, attempt or offer to have the warrant dropped.

By reason of Songer's inability to appear in court on the day the prosecution against Flynn was set for trial, and on a later date to which the proceeding was continued, the warrant was dismissed, and this litigation ensued.

█ Motions for a directed verdict by each side were overruled, and the case was submitted to the jury under instructions based on the theories of both malicious prosecution and abuse of process. As it is our opinion that Flynn was entitled to a directed verdict on the issue of abuse of process, discussion of the malicious prosecution question would be unnecessary but for the fact that he failed to follow up his motion for a directed verdict with a motion for judgment n. o. v., and moved only for a new trial. Hence a new trial is all he can be granted on this appeal. Clay's Kentucky Practice, CR 50.02, Comment 6; Highway Transport Company v. Daniel Baker Company, Ky., 398 S.W.2d 501 (rehearing denied February 11, 1966).

█ The absence of probable cause is an essential element of a cause of action for malicious prosecution. Prosser on Torts (3d ed.), § 113, p. 853; Bruce v. Scully, 162 Ky. 296, 172 S.W. 530, 532 (1915). It was Van Horn's opinion, and he so advised Songer, that by instituting a lawsuit in behalf of his corporate employer Flynn had engaged in the practice of law. Flynn's principal contention in this respect was that this action did not constitute practice of law.

Evidently it was the custom of the justice of peace in whose court Flynn initiated the proceeding against Songer to entertain oral pleading (a procedure formerly authorized by § 705 of the Civil Code of Practice but not permissible under the Rules of Civil Procedure, which superseded the Civil Code on July 1, 1953). In this instance the justice provided and filled out a form affidavit (cf. KRS 425.195) and bond (KRS 425.205) and Flynn signed them as "General Tire Service, by Gene P. Flynn," following which the attachment order was issued.

"Natural persons may appear in court, either by themselves or by their attorney. * * * A corporation * * * can appear only by attorney, while a natural person may appear for himself." Marshall, C. J., in Osborn v. Bank of the United States, 9 Wheat. (U.S.) 738, 6 L.Ed. 204, 226 (1824). "A corporation cannot practice law and must have a licensed attorney representing it in court matters. Tuttle v. Hi-Land Dairyman's Association, 10 Utah 2d 195, 350 P.2d 616, 617 (1960).

■ It is not necessary that we decide in this case whether Flynn, by instituting litigation for his corporate employer, actually engaged in the practice of law. In view of the respectable authority to the effect that a corporation can engage in litigation only through a licensed practitioner, it is clear at least that Van Horn had probable cause to believe that in undertaking this function for his employer Flynn had wrongfully invaded the field of law practice. Our conclusion, therefore, is that the evidence was not sufficient to authorize an instruction permitting recovery against Van Horn for malicious prosecution.

■ With respect to Songer also the evidence did not justify an instruction authorizing recovery for malicious prosecution, because it is beyond cavil that he had acted on the advice of counsel after full disclosure of the material facts. Cf. Mayes v. Watt, Ky., 387 S.W.2d 872 (1964).

Measured against the requisites of a cause of action for abuse of process, the sufficiency of the evidence presents another question. "Abuse of process differs from malicious prosecution in that the gist of the tort is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance. * * * The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort." Prosser on Torts (3d ed.), § 115, pp. 876–877.

■ It is true that both Songer and Van Horn denied any intent or attempt at coercion upon Flynn, but at the same time each of them admitted having communicated with him, on the day the warrant for his arrest was issued, in an effort to obtain a release or settlement of the attachment Flynn had caused to be levied on Songer's wages. Considering these actions in the light of Van Horn's own testimony that when Songer had asked him what he could do about the attachment he advised Songer "he could fight the attachment in court, have a hearing, or he could get a warrant for Gene Flynn for practicing law without a license," and Songer's admission that his purpose in procuring the warrant included "fighting the garnisheement," it would transcend the uttermost bounds of reasonable credulity to believe that Songer and Van Horn did not expect and intend the pressure of the criminal process to per-

form a catalytic agency in persuading Flynn to release the attachment. It makes no difference whether they did or did not intend to withdraw the criminal charge, provisionally or otherwise. The gist of the tort is that they attempted to use it as a means to secure a collateral advantage.

■ We have a very natural reluctance to say that the case should not have been submitted to the jury, but the facts are simply too plain to hold otherwise with a straight face. If upon a retrial the evidence is substantially the same, Flynn will be entitled to a directed verdict on proper motion.

■ Though advice of counsel is a defense in an action for malicious prosecution, it is not so with respect to abuse of process. That is because advice of counsel really is a form of probable cause, and probable cause is not a defense to an action on abuse of process. Cf. Prosser on Torts (3d ed.), § 113, pp. 860, 861. However, insofar as Songer is concerned, evidence of his reliance on Van Horn's advice is admissible in mitigation of damages. 1 Am.Jur.2d 268 (Abuse of Process, § 23).

In the course of presenting his case Flynn sought to introduce proof of another instance in which Van Horn and a man named Cupps were alleged to have caused an arrest warrant to be issued against one William T. Lewis for practicing law without a license. According to Lewis's testimony given by avowal, he was assistant manager of a finance company and had attached Cupps's wages in the same justice's

court and in the same manner as Flynn had attached Songer's wages in this case. He said that Van Horn called him on the telephone, advised him of the warrant, and told him that unless he dropped the suit against Cupps he would be arrested within half an hour. Also by avowal, the clerk of the Fayette Quarterly Court testified that in November of 1961 a warrant was issued for the arrest of William Lewis on the basis of an affidavit of Clifford Cupps charging him with practicing law without a license, and that the warrant was dismissed on November 24, 1961, at the request of the prosecuting witness. The evidence having been rejected, Van Horn of course did not have occasion or opportunity to give his version of the matter.

■ It is our opinion that the evidence should have been admitted with an admonition that it be considered only for such bearing it may have on the question of what Van Horn's motive and intentions were in connection with Flynn's claim against Songer. It is well settled that similar contemporaneous transactions are admissible for that purpose. Head v. Oglesby, 175 Ky. 613, 194 S.W. 793, 797 (1917); National Council of the Knights, etc. v. Rowell, 276 Ky. 335, 123 S.W.2d 1041, 1044 (1938).

Upon another trial, evidence of threats and hostilities between the lawyers subsequent to the legally operative events of this case should be excluded.

The cause is reversed for further proceedings consistent with this opinion.